IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MELISA CROOK,[1] <br><br>       Plaintiff, <br><br> v. <br><br> CRESTON COMMUNITY SCHOOL DISTRICT; BOARD OF DIRECTORS OF CRESTON COMMUNITY SCHOOL DISTRICT; DERON STENDER, in his individual and official capacities as Superintendent of the Creston Community School District; and DON GEE, in his individual and official capacities as President of the Board of Directors of the Creston Community School District, <br><br>       Defendants. | **No. 4:25-cv-00373-RGE-HCA** <br><br><br> **ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |

## I.    INTRODUCTION

Plaintiff Melisa Crook files a motion for temporary restraining order and preliminary injunction against Defendants Creston Community School District, the Board of Directors of Creston Community School District, Deron Stender, and Don Gee. Crook posted a comment on Facebook in response to a family member's post about the death of Charlie Kirk. Crook was placed on administrative leave and issued a Notice of Recommendation to Terminate her teaching contract shortly after she posted her comment on Facebook. In her motion for temporary restraining order and preliminary injunction, Crook alleges Defendants have discriminated against her and subjected her to retaliation in violation of the First Amendment. Crook requests a temporary restraining order

---

[1] Plaintiff's complaint and motion for temporary restraining order and preliminary injunction are inconsistent as to the spelling of her name. Pl.'s Compl. TRO & Prelim. Inj., ECF No. 1; Pl.'s Mot. TRO & Prelim. Inj., ECF No. 12. The Court refers to Plaintiff as "Melisa Crook," as indicated on Plaintiff's Civil Coversheet. Pl.'s Civil Coversheet 1, ECF No. 1-1.

and preliminary injunction requiring Defendants to reinstate her to her teaching and extracurricular positions. Crook also requests Defendants be barred from pursuing further termination proceedings against her.

For the following reasons, the Court grants in part and denies in part Crook's motion for a temporary restraining order. A hearing on the motion for preliminary injunction will be set by separate order.

## II.    PROCEDURAL POSTURE

Melisa Crook filed a complaint including a request for a temporary restraining order and preliminary injunction, alleging violations of her First Amendment rights. Pl.'s Compl. TRO & Prelim. Inj., ECF No. 1. Defendants resist, arguing Crook's complaint is procedurally improper, she does not sufficiently allege irreparable harm, and she is not likely to succeed on the merits of her claim. Defs.' Br. Supp. Resist. Pl.'s Compl. TRO & Prelim. Inj., ECF No. 9-1. Crook then filed a motion for temporary restraining order and preliminary injunction. Pl.'s First Mot. TRO & TRO, ECF No. 12; Pl.'s Br. Supp. Mot. TRO & Prelim. Inj., ECF No. 12-1. The Court now considers the request for a temporary restraining order and withholds ruling on the request for a preliminary injunction pending hearing.

Crook requests the Court grant her relief by enjoining Defendants' decision to place her on administrative leave and enjoining Defendants from pursuing termination proceedings against her. ECF No. 1 at 12–13. Crook requests an injunction restraining Defendants from discriminating against her or retaliating against her for her Facebook comment. *Id.* at 13. Crook also requests punitive damages and attorney fees. *Id.*

## III.   FACTUAL SUMMARY

Because of the preliminary nature of a temporary restraining order, the Court's findings of fact and conclusions of law in this order are not binding in future proceedings. *See Univ. of Tex. v.*

*Camenisch*, 451 U.S. 390, 395 (1981).

Melisa Crook is a high school English teacher and District dance team leader employed by Creston Community School District. ECF No. 1 at 1, 3. Crook has been employed by Creston Community School District since May 18, 2022, on a continuing teaching contract. *Id.* ¶ 13.

On September 10, 2025, Charlie Kirk was shot while speaking at an event at Utah Valley University. *Id.* ¶ 18. On the evening of September 10, at her home and on her personal time, Crook opened her personal Facebook account and saw a post from a member of her family. *Id.* ¶ 2, 20; *see* ECF No. 12 ¶ 4. Crook responded to the post with the comment: "He is a terrible human being . . . terrible. I do not wish death on anyone, but he [sic] him not being here is a blessing." ECF No. 1 ¶ 2.

That same evening, The Iowa Standard, a news outlet, reported on Crook's comment. *Id.* ¶ 21. Shortly thereafter, The Iowa Standard reported on a statement attributed to the Creston Community School District. *Id.* ¶ 22. The District stated in part, "I want to take a moment to address a recent post that has come to my attention. Please know that I am fully aware of the situation, and I want to assure you that the content of that post does not reflect the values, beliefs, or opinions of our district." *Id.* The statement included Crook's comment. *Id.*

The next morning, Crook "noticed her comment had been perceived in a way she did not anticipate." *Id.* ¶ 23. Crook apologized for offending anyone and clarified she was "[n]ot wishing anyone death." Pl.'s Ex. N Supp. Compl. TRO & Prelim. Inj.1, ECF No. 1-16. Later that morning, Crook posted a more extensive apology to her Facebook page:

> I want to clarify a statement I made yesterday. I do NOT condone violence or the killing of people you disagree with politically or otherwise. That was never my intent. That is not who I am, nor what I believe. I believe strongly in the freedom of speech which also means I can disagree. I do not treat others poorly or wish them any harm because we do not agree. I am actually very open and accepting of different people with different ideas.

The point I was trying to make is that he has marginalized a lot of powerless people, creating polarized political discourse. I believe all people have the right to their own beliefs, including me.

I am sorry I have offended people in this community, believing that I condone killing others. I did not think he should be killed. After further review, I should have thought more about how I chose to post my thoughts, how it would sound. I take responsibility for the poor wording of my post.

ECF No. 1 ¶ 23.

On the afternoon of September 11, 2025, Deron Stender, Superintendent of the Creston Community School District, called Crook to an investigatory meeting. *Id.* ¶ 25. He asked her multiple times about the meaning of and her intent behind using the word "blessing" in her original Facebook comment. *Id.* At the end of the meeting, Stender placed Crook on administrative leave pending the outcome of the investigation. *Id.*

On September 12, 2025, Stender released a message to parents, stating "I am writing to provide an update regarding a current personnel matter in the District. Please know that we are carefully reviewing the situation in accordance with Board policy and applicable laws . . . ." Pl.'s Ex. I Supp. Compl. TRO & Prelim. Inj. 1, ECF No. 1-11. Two days later, Stender released another message, stating "I want to be clear: personal views have no place in the instruction of our children" and noting the law enforcement presence at schools was a "precautionary measure." Pl.'s Ex. K Supp. Compl. TRO & Prelim. Inj. 1, ECF No. 1-13.

On September 15, 2025, Stender called Crook to a meeting to let her know the investigation had concluded. ECF No. 1 ¶ 29. The investigative report dated September 15, 2025, contends the Superintendent's Office received "more than 111 emails and 140 calls," the vast majority of which originated from parents "asking for [Crook's] termination or requesting to have their children removed from [Crook's] classroom." Pl.'s Ex. J Supp. Compl. TRO & Prelim. Inj. 1, ECF No. 1-12. The report also stated Crook's Facebook comment "resulted in the need to increase law

enforcement presence" and "violates district policy 401.14 Employee Expression and potentially others." *Id.*

On September 23, 2025, Stender delivered to Crook a Notice of Recommendation to Terminate Crook's continuing teaching contract. ECF No. 1 ¶ 33. The Notice lists nine reasons for which Stender recommended Crook's termination, "any one of which constitutes just cause." Pl.'s Ex. E Supp. Compl. TRO & Prelim. Inj. 1, ECF No. 1-7. Each of the nine reasons refers directly or indirectly to Crook's Facebook comment. *Id.* The Notice specifically notes Crook's conduct violated Board Policies 401.14, 404, 404.1R1, and 404.1R2. *Id.* Following receipt of the Notice, Crook requested a hearing in front of the Board. ECF No. 1 ¶ 36. Stender also delivered his Notice of Recommendation to Terminate Crook's continuing teaching contract to the Board, as required by Iowa Code § 279.15. *Id.* ¶ 37. The Board set a hearing on Crook's termination for October 21, 2025. *Id.* ¶ 38.

Crook's union representative inquired to the Creston Police Department and Union County Sheriff's Office about whether there was an increase in law enforcement presence in the District on or after September 11, 2025. *Id.* ¶ 34. The Sheriff stated to Crook's union representative that the Sheriff communicated with Stender about a rumor among students about possible violence toward the school because of a teacher's post. *Id.* Stender told the Sheriff the District had investigated the rumor and found it not to be credible but requested law enforcement presence at the school anyway. *Id.* The Sheriff told the union representative law enforcement increased their presence at the school because of "an abundance of caution" and "because you never know." *Id.*

Employees at the District stated there was "little to no disruption in their work or the educational environment" from Crook's Facebook comment. *Id.* ¶ 35. Multiple employees noted disruption was mostly caused by lack of coverage for the English department in Crook's absence. *Id.*

The Court sets out additional facts as necessary below.

## IV.    LEGAL STANDARD

The four factors the Court considers when determining whether to issue a temporary restraining order are set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*: 1) "the probability that movant will succeed on the merits"; 2) "the threat of irreparable harm to the movant"; 3) "the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant"; and 4) "the public interest." 640 F.2d 109, 113 (8th Cir. 1981); *see also Sports Design & Dev., Inc. v. Schoneboom*, 871 F. Supp. 1158, 1162–63 (N.D. Iowa 1995) (citing *S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989)). When a plaintiff seeks to restrain governmental action, the public interest and balancing of harm factors largely merge. *See Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022). Ultimately, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1989) (citation omitted).

"Success on the merits has been referred to as the most important of the four [*Dataphase*] factors." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). "When determining the likelihood of [Plaintiff's] success on the merits, [the Court does] not have to decide whether [Plaintiff] will ultimately win, [but a]n injunction cannot issue if there is no chance of success on the merits." *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (cleaned up) (citations omitted). Further "[Plaintiff] does not need to prove a greater than fifty per cent likelihood that [she] will prevail on the merits." *Id.* at 1044–45 (citation omitted). But Plaintiff "must . . . show a 'fair chance of prevailing.'" *Id.* at 1045 (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir.

2008) (en banc)). When a plaintiff asserts multiple claims and seeks preliminary relief, "[t]he plaintiff need only establish a likelihood of succeeding on the merits of any one of [her] claims." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (internal quotation marks and citation omitted).

## V.    DISCUSSION

Application of the *Dataphase* factors is not a "rigid formula." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999). "No single factor in itself is dispositive; in each case all the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Calvin Klein Cosms. Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987). Nevertheless, likelihood of success on the merits is the most significant factor. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).

The Court considers each *Dataphase* factor as applied to Crook's claims against Deron Stender. The Court does not analyze the claims against the remaining defendants for the purposes of the temporary restraining order. The Court concludes each *Dataphase* factor weighs in favor of Crook as to her claims against Stender.

### A.    Likelihood of Success on the Merits

The likelihood of success on the merits is the most significant *Dataphase* factor the Court considers when evaluating whether to grant a temporary restraining order. *Cf. Home Instead*, 721 F.3d at 497.

Crook brings a § 1983 claim against Defendants, alleging retaliation and discrimination in violation of her First Amendment rights. ECF No. 1 ¶¶ 39–52. As a general matter, "public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

To establish a violation of her First Amendment rights, Crook must show "(1) that [s]he engaged in a constitutionally protected activity; (2) that the defendant[s] took adverse action against [her] that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated in part by [Crook]'s exercise of [her] constitutional rights." *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).[2] The Court must determine whether Crook is likely to succeed on the merits of her First Amendment claim.

To determine whether Crook's speech is constitutionally protected, the Court first must determine whether she spoke as a citizen on a matter of public concern. *See Mayfield v. Mo. House of Reps.*, 122 F.4th 1046, 1053 (8th Cir. 2024); *see Connick v. Myers*, 461 U.S. 138, 147 (1983); *Lane v. Franks,* 573 U.S. 228, 235–36 (2014) ("[S]peech by citizens on matters of public concern lies at the heart of the First Amendment."). If Crook spoke as a citizen on a matter of public concern, "the next question is whether [Defendants have] produced evidence to indicate the speech had an adverse impact on the efficiency of the [employer's] operations." *Mayfield,* 122 F.4th at 1053 (internal quotation marks and citation omitted) (alternations in original). If Defendants have produced evidence of an adverse impact, the Court engages in a *Pickering* balancing inquiry. *See Pickering v. Board of Education,* 391 U.S. 563, 568 (1968). Whether Crook's speech is constitutionally protected is a question of law for the Court to determine. *See Hinshaw v. Smith,* 436 F.3d 997, 1004 (8th Cir. 2006).

---

[2] Crook's complaint does not clearly identify whether she is alleging a claim of First Amendment retaliation for her speech or First Amendment political discrimination for her political status or affiliation. *See, e.g.,* ECF No. 1 ¶ 50 ("Actions of Defendants have denied Crook her First Amendment right to speak, discriminated against her for her viewpoint and expression of her viewpoint, and retaliated against her for the exercise of her right to speak and her particular viewpoint."). However, the tests used to evaluate both retaliation and political discrimination claims "are similar enough to be stated together." *Charleston v. McCarthy*, 175 F. Supp. 3d 1115, 1122 (S.D. Iowa 2016); *see also Wagner v. Jones*, 664 F.3d 259, 270 (8th Cir. 2011).

For purposes of considering the motion for the temporary restraining order, the Court finds Crook spoke as a citizen on a matter of public concern when posting her Facebook comment. "A public employee's speech is not protected by the First Amendment if it 'owes its existence' to [the employee's] professional responsibilities," *McGee v. Pub. Water Supply Dist. No. 2*, 471 F.3d 918, 921 (8th Cir. 2006) (quoting *Garcetti*, 547 U.S. at 411), because "a public employee does not speak as a citizen if he speaks pursuant to his job duties," *Lindsey v. City of Orrick*, 491 F.3d 892, 898 (8th Cir. 2007). Additionally, "[s]peech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (internal quotation marks and citations omitted). In determining whether speech is protected, the court must examine the "content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.

Crook posted her Facebook comments on her personal time, at home, from her personal Facebook account. ECF No. 1 ¶ 2. She did not purport to speak as an employee of the Creston Community School District. *Id.* ¶ 3. Her comment responded to and discussed the murder of a public figure, Charlie Kirk, and her longer post clarified her intent in posting the comment. *Id.* ¶¶ 2, 23. ("The point I was trying to make is that he has marginalized a lot of powerless people, creating polarized political discourse"). The content, form, and context of Crook's Facebook comment and post indicate her engagement with a public news story published and discussed across traditional media outlets and social media outlets. ECF No. 12 ¶ 4; *cf. Connick,* 461 U.S. at 147–48. This speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Lane*, 573 U.S. at 241. Thus, Crook spoke as a citizen on a matter of public concern in her Facebook comments.

Because Crook spoke as a citizen on a matter of public concern, the Court must next determine whether Defendants have produced evidence to indicate Crook's speech had an adverse impact on the efficiency of their operations. *Cf. Mayfield*, 122 F.4th at 1053. At this stage of the litigation, the Court determines Defendants' allegations of harm to school operations are insufficient to warrant denial of a temporary restraining order. Defendants allege the district received "111 emails and 140 phone calls," the vast majority of which originated from parents "asking for [Crook's] termination or requesting that their children be removed from [Crook's] class." ECF No. 9-1 at 8; *see* ECF No. 1-12 at 1. Defendants cite Crook's "inability to effectively work with the parents of her students," which "would significantly hamper her job performance" as evidence of disruption. ECF No. 9-1 at 9. Further, Defendants allege Crook's speech made it "impossible for her to serve as a positive role model for her students." *Id.* Significantly, "[m]ere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient." *Lindsey*, 491 F.3d at 899. Without further evidence, denying a temporary restraining order on "such 'vague and conclusory' concerns . . . runs the risk of constitutionalizing a heckler's veto." *Melton v. City of Forrest City, Ark.,* 147 F.4th 896, 903 (8th Cir. 2025) (quoting *Sexton v. Martin*, 210 F.3d 905, 912 (8th Cir. 2000)). Defendants have not produced sufficient evidence to indicate Crook's speech had an adverse impact on the operations of the District.

"Where there is no evidence of disruption, resort[ing] to the *Pickering* factors is unnecessary because there are no government interests in efficiency to weigh against First Amendment interests." *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020) (internal quotation marks and citations omitted). Because the Court determined there is a lack of evidence of disruption to the District, the Court need not engage with the *Pickering* factors at this stage of the litigation. If warranted, the Court will engage in a *Pickering* analysis at the preliminary injunction stage when analyzing further evidence necessary to balance the interests of Crook as a citizen with

the interests of an efficient workplace. *Cf. Pickering*, 391 U.S. at 568.

Lastly, the Court concludes Stender took adverse action against Crook and the adverse action was motivated in part by Crook's exercise of her First Amendment rights. *Cf. Scheffler*, 743 F.3d at 621. Crook may establish "adverse employment action" by showing she suffered "a material change in the terms or conditions" of her employment and that the change would "chill a person of ordinary firmness" from continuing to engage in activity protected by the First Amendment. *Grooms v. Privette*, 127 F.4th 730, 734 (8th Cir. 2025) (internal quotation marks and citation omitted). Crook's placement on administrative leave and the delivery of the Notice of Recommendation to Terminate her teaching contract to both Crook and the Board are sufficient evidence of a material change in her employment conditions that would chill a person of ordinary firmness from engaging in constitutionally protected speech. ECF No. 1 ¶¶ 25, 33, 27; *see* ECF No. 12 ¶ 9; *cf. Grooms*, 127 F.4th at 734. Further, Crook has sufficiently alleged her protected speech was the "substantial or motivating factor" in Stender's decision to place her on administrative leave and act on the Notice of Recommendation to Terminate. *Cf. Henry*, 950 F.3d at 1011. Stender placed Crook on administrative leave directly after calling her to an investigative meeting to discuss her Facebook comment. ECF No. 1 ¶ 25. The investigative report given to Crook on September 15, 2025, explicitly references her Facebook comment and the purported effects of the comment. ECF No. 1-12 at 1. Each of the nine reasons listed in the Notice of Recommendation to Terminate, delivered to both Crook and the Board, directly or indirectly references Crook's Facebook comment. ECF No. 1-7 at 1. The Court determines Crook is likely to succeed in showing Stender took adverse action against her in response to exercise of her First Amendment rights.

Because Crook produced evidence she was engaged in a constitutionally protected activity, the adverse action against her would chill a person of ordinary firmness in continuing the activity,

and the adverse action was motivated at least in part by Crook's exercise of her First Amendment rights, the Court concludes Crook is likely to succeed on the merits of her First Amendment claim as to Stender.

### B.    Threat of Irreparable Harm

In regard to the second *Dataphase* factor, Crook contends she has "already suffered irreparable harm" due to Defendants' actions and "[t]here is no adequate remedy at law for the violations of [her] constitutional rights." ECF No. 1 ¶ 53. Further, Crook alleges "[p]ublic notice, discipline and/or termination of her continuing teaching contract have and will irreparably damage Crook's professional and personal reputation and further chill the exercise of her First Amendment rights." ECF No. 12 ¶ 9.

"To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski*, 648 F.3d at 706 (quoting *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996)). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

Crook has met her burden of showing irreparable harm resulting from deprivation of her First Amendment rights. *See Gen. Motors Corp.*, 563 F.3d at 318–19 (clarifying the "burden [is] on [the movant] to establish the threat of irreparable injury"). In cases implicating the First Amendment, courts assume irreparable injury because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (internal quotation marks and citation omitted); *see also Iowa Right to Life Comm., Ins. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999). Defendants erroneously focus on Crook's loss of employment rather than her First Amendment

injuries. Defendants argue Crook failed to establish irreparable harm because, in the event Crook succeeds on the merits of her claims, she can fully recover through an award of monetary damages. ECF No. 9 at 4–5. Defendants also contend Crook failed to establish irreparable harm because she may be able to "present her own evidence and cross examine the superintendent's witnesses at the upcoming hearing." *Id.* at 5. The Notice of Recommendation to Terminate Crook's teaching contract in response to her Facebook comment and her placement on administrative leave threatens Crook's employment in direct response to her exercise of her First Amendment rights. Because Crook established she is likely to succeed on her First Amendment claim, which implicates the loss of her First Amendment freedoms, the Court concludes the threat of irreparable harm weighs in favor of Crook.

### C.    Balance of Harms and Public Interest

When a plaintiff seeks injunctive relief against the government, the public interest and balancing of harm factors largely merge. *See Eggers*, 48 F.4th at 564. Under the balance of harm factor, the Court considers "the balance between th[e] harm [to the plaintiff] and the injury that the injunction's issuance would inflict on other interested parties." *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994). This factor requires examining the harm granting or denying the injunction poses to all parties to the dispute, as well as other interested parties. *See Dataphase*, 640 F.2d at 113–14; *accord Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994). Under the public interest factor, the Court considers whether a temporary restraining order would serve the public interest. *Dataphase*, 640 F.2d at 113. The public interest necessarily includes protecting constitutional rights. *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), overruled on other grounds by *Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc). Notably, "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are

generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (quoting *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam). The Court concludes the final two *Dataphase* factors favor issuance of a temporary restraining order.

Crook's placement on administrative leave and threatened termination in violation of the First Amendment must be balanced against the injury an injunction would inflict on Defendants. Defendants argue they would be "significantly prejudiced by this Court interfering with their ability to operate government services" if the Court grants an injunction. ECF No. 9 at 12. Defendants contend a temporary restraining order or preliminary injunction in this case defeats Defendants' decision to discharge an employee and impermissibly extends the employment of a potentially incompetent employee. *Id.* at 12–13. The Court finds the enforcement of First Amendment rights outweighs any potential employment harm to Defendants. Further, the public has a compelling interest in protection of First Amendment and other constitutional rights. *See Phelps-Roper*, 545 F.3d at 690 ("[I]t is always in the public interest to protect constitutional rights.").

On balance, the relative hardships and public interest justify granting Crook's request for temporary relief.

### D.    Bond

After considering the relevant factors, the court exercises its discretion to waive the bond requirement in Federal Rule of Civil Procedure 65(c). *See Rickland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).

## VI.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Plaintiff Melisa Crook's Motion for Temporary Restraining Order

and Preliminary Injunction, ECF No. 12, is **GRANTED IN PART** and **RESERVED IN PART.** The temporary restraining order is granted as set forth below. The request for preliminary injunction is deferred until after the October 31, 2025 hearing as set below.

**IT IS FURTHER ORDERED** that Defendants are enjoined from holding the employment hearing scheduled for October 21, 2025, and taking any other adverse employment actions against Plaintiff Melisa Crook based on the Notice of Recommendation to Terminate prepared by Defendant Deron Stender. Defendants are further enjoined from taking any adverse employment actions against Plaintiff Melisa Crook based on her Facebook comment.

**IT IS FURTHER ORDERED** that Plaintiff Melisa Crook's request to be removed from administrative leave is denied at this time. This temporary restraining order will remain in effect for fourteen days unless extended for good cause. Fed. R. Civ. P. 65(b)(2).

**IT IS FURTHER ORDERED** that a preliminary injunction hearing is set for October 31, 2025, at 1:00 p.m.

**IT IS SO ORDERED**.

Dated this 20th day of October, 2025.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE