**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| MELISSA CROOK,<br><br>      Plaintiff,<br><br>v.<br><br>CRESTON COMMUNITY SCHOOL DISTRICT, BOARD OF DIRECTORS OF THE CRESTON COMMUNITY SCHOOL DISTRICT, DON GEE, in his individual and official capacities as President of the Board of Directors of the Creston Community School District, and DERON STENDER, in his individual and official capacities as Superintendent of the Creston Community School District<br><br>      Defendants. | NO.  4:25-cv-00373-SHL-HCA<br><br><br><br>**PLAINTIFF MELISA CROOK'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

I. Introduction……...................................................................................................................1

II. Factual Background...........................................................................................................1

   A. Crook's Speech Was Private, Political Expression…..……………………………...........1

   B. The District Immediately Condemned Crook's Speech, Continued to Publicize Her Employment Status, and Sensationalized Its Impact………………………………….…….…....2

   C. The District's Core Mission Was Met and the Educational Environment was Not Impacted by Substantial Disruption………………………………………….………………4

   D. The District Initiated Termination Based Solely on Crook's Speech………………………5

III. Legal Standard...................................................................................................................5

IV.  Argument………................................................................................................................6

   A.  Success on the Merits………………………………………………………………………6

      1.   Crook's Facebook Post was Speech as a Private Citizen on a Matter of Public Concern………………………………………………………………………6

      2. Crook's First Amendment Rights Outweigh Any Adverse Impact on the District's Operations, If Applicable………………………………………………………8

      3. The District's Motive for Adverse Action Was Crook's Speech…………………………13

B.  Irreparable Harm to Crook and Relative Harm to Defendants……………….……….14

C. Public Interest……………………………………………………………………………………16

V. Crook's Objections to Defendants' Exhibits……………………………………………………17

A. District Exhibit F: "Total Calls" Chart and Incoming Message Log…………………….17

B. District Exhibit J: "Incidents of Safety Threats"………………………………………….19

1. Exhibit J Documents to which Crook Does Not Object……………………………….19

a. Dillon Daughenbaugh's Post on Page 1…………………………………………….19

b. September 12 Emails and Stender Post on Pages 4 and 5…………………….……19

c. Stender's Text Messages Regarding His Request for Additional Law
Enforcement………………………………………………………………………...20

2. Exhibit J Documents that are Inadmissible Hearsay Under Rule 801……………….…20

3. Exhibit J Documents that are Inadmissible Under Rule 401, 402, and/or 403…..……21

C. District Exhibit K: Driskell September 12 Memo re: "Concerned Students"…………….21

D. District Exhibit M: Various Social Media Posts…………………………………………22

E. District Exhibit N: Voicemail Recordings……………………………...……………….22

F. District Exhibit O: Phone Log……………………………………………..…………….23

G. Defendants' Declarations………………………………………………………………….23

1. Addison Downing……………………………………………………………….……24

2. Cody Frey……………………………………………………………………………24

3. Virgina Harlan………………………………………………………………………24

4. Amy Lane………………………………………………………………...………….24

VI. Conclusion.......................................................................................................................25

## I. INTRODUCTION

Plaintiff Melissa Crook (hereinafter "Crook") is a high school English teacher employed by the Creston Community School District (hereafter "District"). Crook was placed on administrative leave and threatened with termination based on a single Facebook comment— posted at home, on her own time, from a personal social media account—expressing her political viewpoint of the political activist Charlie Kirk. Her speech was plainly that of a private citizen on a matter of public concern. The District's severe adverse actions—removal from the classroom, ban from school grounds and events, public condemnation, widespread disclosures of her confidential personnel information, and initiation of termination proceedings—violate her freedom of speech protected by the First Amendment to the U.S. Constitution.

On October 7, 2025, Crook filed a complaint for injunctive and declaratory relief alleging violation of her First Amendment rights. Her complaint included a request for immediate relief through a temporary restraining order and preliminary injunction. The Court granted a temporary restraining order preventing the District from taking further adverse employment actions, but allowed the District to keep Crook on administrative leave. The Court must now address Crook's request for preliminary injunctive relief. A preliminary injunction is necessary to prevent the District from compounding its constitutional violations during the pendency of this case.

## II. FACTUAL BACKGROUND

### A. Crook's Speech Was Private, Political Expression

On September 10, 2025, political activist and commentator Charlie Kirk was shot while he spoke at Utah Valley University. Hannah Schoenbaum, Alanna Durkin Richer, Mark Sherman & Eric Tucker, *Conservative activist Charlie Kirk assassinated at Utah university*, Associated Press, September 10, 2025, https://apnews.com/article/charlie-kirk-conservative-activist-shot-

546165a8151104e0938a5e085be1e8bd. Kirk was a controversial political figure aligned with conservatives and the Republic party. *Id*.

Between 4:30 and 5:30 p.m. on September 10, Crook noticed a Facebook post by a family member praising Kirk. Crook Test.; Pl.'s Ex. 5, ECF 27-5 p. 2 (expressing Kirk was "the reason I decided to vote this year"). Feeling Kirk had marginalized members of their family, Crook was shocked by the positivity of the post, and commented - "He is a terrible human being . . . terrible. I do not wish death on anyone, but he him (sic) not being here is a blessing." *See* Pl.'s Ex. 4, ECF 27-4 p. 1. When Crook posted the comment, her workday had ended and she used her own technology on her personal time, in the privacy of her own home. Crook's comment made no reference to her employment or her employer.

At 9:03 p.m., unbeknownst to Crook, the Iowa Standard posted a screenshot of her comment, stating, "Unbelievably, this is a third Iowa teacher who has allegedly made such a comment regarding Charlie Kirk's assassination. This teacher works in the Creston School District . . . ." Pl.'s Ex. 15, ECF 27-15, p. 1.

**B.    The District Immediately Condemned Crook's Speech, Continued to Publicize Her Employment Status, and Sensationalized Its Impact**

At 9:26 p.m., District Superintendent Deron Stender (hereinafter "Stender") sent Crook a text notifying her that he had "consulted with the district attorney" regarding her "recent post" and placing her on administrative leave. *See* Pl.'s Ex. 6. At 9:39 p.m., Stender published a message through the District's ParentSquare platform "to address a recent post made on social media by a school employee" and stating, in part, "I want to assure you that the post does not reflect the values, beliefs, or opinions of the district." Pl.'s Ex. 7, ECF 27-7.

When Crook arose around 5 a.m. on September 11, she learned of the attention her comment had garnered overnight. Crook Test. She posted a second comment to her family

member's post: "Not wishing anyone death, just noting that he was a dangerous man. I am sorry to have offended anyone. I do not think anyone should be dead in this situation - I should have chosen my words better. I apologize for offending anyone." *See* Pl.'s Ex. 4, ECF 27-4 p. 2. Around 11:30 a.m., on her own Facebook account, Crook posted a lengthier clarification and apology. *See* Pl.'s Ex. 5, ECF 27-5 p. 1.

In the afternoon on September 11, Stender met with Crook to conduct an investigatory meeting. Crook Decl., Pl.'s Compl. TRO & Prelim. Inj., Ex. A, ECF 1-3 ¶ 7. His questions repeatedly circled back to her intent behind the use of the term "blessing" and described this reference as "the crux of the problem." *Id*. Crook explained that she meant Kirk's statements and ideology were harmful to some of her loved ones, her students, and colleagues who were members of the LGBTQ+ community. *Id*.

Stender reported to the Board of Directors at 8:57 p.m. that he had conducted an investigation into Crook's "intentions and social media post" and that his office was "collecting and logging all emails, texts, phone calls, and other forms of communication in regard to this matter from individuals." Def.'s Ex. G, ECF 26-7 p. 7.

On September 12, at 10:00 a.m., Stender published a message through the District's ParentSquare platform to inform parents and families "that the employee involved has been placed on administrative leave pending the outcome of" his review. Def.'s Ex. G, ECF 26-7 p. 1. At the same time Stender's message was going out, Athletic Director and High School Assistant Principal Scott Driskell (hereinafter "Driskell") became aware that female students had been discussing the possibility of the school being a target for a shooter. Def.'s Ex. J, ECF 26-10; Def.'s Ex. K, ECF 26-11. Driskell informed High School Principal Bill Messerole (hereinafter "Messerole"). Driskell had already interviewed the students involved and determined that no

direct threat existed. *Id*. At 10:14 a.m., Driskell emailed all high school teachers, copying Stender, and reporting that they were "aware of a rumor circulating regarding possible school violence" and that all should "be reassured that we are taking this seriously – we will be present in the hallways and common areas throughout the day." Pl.'s Ex. 9, ECF 27-9.

Less than ten minutes after Driskell's email, at 10:23 a.m., Stender sent a text to Union County Sheriff Brian Bolton: "Hi Brian. Can you please send one or two of your guys to help have a presence due to a (sic) unsubstantiated concern and threat associated [with] (sic) my personnel issue." Pl.'s Ex. 14, ECF 27-14 p. 7. Stender responded to Driskell's email at 10:31 a.m., stating, "This is a district concern, and I will share with all district staff. I have asked Mitch to increase law enforcement personnel and have called Sheriff Bolton to do the same. I will also send a PS message to parents." Pl.'s Ex. 9, ECF 27-9. Stender's message reported, "we have asked local law enforcement to be present at school for the remainder of the day to provide additional support and reassurance." Pl.'s Ex. 8, ECF 27-8. Four students left the high school "due to the perceived threat." Def.'s Ex. J, ECF 26-10.

### C.    The District's Core Mission Was Met and the Educational Environment was Not Impacted by Substantial Disruption

Law enforcement found no credible threat and increased their presence only out of an "abundance of caution." Butler Decl., Pl.'s Compl. TRO & Prelim. Inj., Ex. M, ECF 1-15 ¶ 9; Sheriff Bolton Test. Teachers and students reported little to no disruption of the educational environment or processes and stated the greatest disruption was the lack of an English teacher due to Crook's absence. Soosloff Test.; *see also* Granger, Linch, Fry-Schnormeier, H. Riley, C. Anderson, Brown, Z. Wagner Decls. Parents confirmed their students felt safe and reported no changes or adjustments to their students' schedules or attendance, but expressed concern for the

4

quality of education in English while Crook was on administrative leave. *See* L. Riley, Sawtell, M. Wagner, Skull Decls.

### D.    The District Initiated Termination Based Solely on Crook's Speech

On September 15, Stender called Crook to a meeting to report the findings of his investigation. *See* Def.'s Ex. H. Stender found Crook's comment "inappropriate and inconsistent with the [D]istrict's values." Def.'s Ex. H, ECF 26-8. Regarding the impact to the District, Stender informed Crook that the District received 111 emails and 140 calls "with the vast majority of them asking for [her] termination or requesting to have their children removed from her classroom." *Id.* He did not inform Crook that only a very small number of those contacts were parents or guardians, or members of the greater Creston community. *Id.*; *see generally* Def.'s Ex. L, ECF 26-12, and Ex. F, ECF 26-6. Stender also informed her that her post resulted in the need for law enforcement out of fear for school safety. Stender then expressed a "willing[ness] to work" with Crook on a "mutual separation." Def.'s Ex. H, ECF 26-8. When Crook chose not to resign, Stender recommended her termination to the Board of Directors. Pl.'s Ex. 10, ECF 27-10.

## III. LEGAL STANDARD

A request for preliminary injunctive relief is evaluated under the familiar *Dataphase* four-factor test: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between that harm and any injury the nonmoving party would suffer if an injunction were granted; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Among these considerations, the likelihood of success on the merits is the most significant. *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). To satisfy this factor, the movant need only demonstrate a "fair chance

of prevailing" on the merits of her First Amendment claim. *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1045 (8th Cir. 2020). Where a movant establishes a violation of First Amendment rights, the remaining factors are generally deemed satisfied. *Schmitt v. Rebertus*, 148 F.4th 958, 966 (8th Cir. 2025).

## IV. ARGUMENT

### A.    Success on the Merits

To prevail on her First Amendment claim, Crook must show (1) she engaged in constitutionally protected conduct; (2) Defendants took adverse action against her which would chill a person of ordinary firmness from continuing with such conduct; and (3) the adverse action was motivated in part by her exercise of her constitutional rights. *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).

### 1.    Crook's Facebook Post Was Speech as a Private Citizen on a Matter of Public Concern

First Amendment protections extend to "teachers and students" as "neither . . . shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527, 142 S. Ct. 2407, 2423 (2022)(citing *Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.*, 393 U. S. 503, 506, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969)) (internal citations omitted). A public employee's speech is constitutionally protected speech when she is speaking as a private citizen on a matter of public concern. *Kennedy*, 597 U.S. at 528. An employee's speech "ow[ing] its existence" to the employee's professional responsibilities is not speech as a private citizen. *Garcetti v. Ceballos*, 547 U.S. 410, 411, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)(finding a prosecutor's interoffice memorandum was speech made pursuant to his official duties).

Crook's Facebook comment was not made on behalf of her employer. *See id.* at 421

(stating "controlling factor . . . is . . . expressions were made pursuant to" employee's duties). It was not "ordinarily within the scope" of Crook's duties. *See Lane v. Franks*, 573 U.S. 228, 223, 134 S. Ct. 2369, 189 L. Ed. 2d 312 (2014) (finding employee's trial testimony was protected despite touching on matters related to his employment). She was not speaking "pursuant to government policy" or "seeking to convey a government-created message." *Kennedy*, 597 U.S. at 529. Instead, Crook made her comment in the privacy of her own home. *See id*. at 530 (noting employee was "free to attend briefly to personal matters"). She did not engage in the speech while on the job, she did not utilize the District's technology or social media accounts, and she made no references to the District. Crook's speech was purely personal and uttered on her own volition, in her capacity as a private citizen.

Further context of Crook's comment also shows it was related to a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 147-48, 103 S. Ct. 1684, 1690 (1983) ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (internal quotations omitted). Crook's comment was made on the evening of Kirk's assassination when countless traditional news and social media outlets were releasing information about the event and Kirk's life. *See Rankin v. McPherson*, 483 U.S. 378, 386, 107 s. Ct. 2891, 97 L. Ed. 2d 315 (1987)(finding speech on the "heel of a news bulletin" on "matter of heightened public attention"). Crook was responding to a family member's post expressing Kirk was the reason she voted. Pl.'s Ex. 5, ECF 27-5 p. 2.

### 2.    Crook's First Amendment Rights Outweigh Any Adverse Impact on the District's Operations, If Applicable

Because Crook's comment was made as a private citizen and addressed a matter of public concern, the analysis shifts to the District to establish that her speech "'created workplace disharmony, impeded [her] performance, . . . impaired working relationships,' or otherwise 'had an adverse impact on the efficiency of the [employer's] operations.'" *Melton v. City of Forrest City*, 147 F.4th 896, 902 (8th Cir. 2025)(citing *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020)). In the absence of such a showing by the District, the Court need not "do a full *Pickering* balancing and weigh these interests against each other." *Melton*, 147 F.4th at 902.

At best, the District's evidence of either an "actual disruption" or a "reasonable belief in the potential for disruption" is weak. The Iowa Standard, Iowa politicians and elected officials, and social media profiles nationwide published threats of retribution and punishment against Crook, other public servants, and private citizens, for what they considered "cheering or condoning political assassination." Pl.'s Ex. 15, ECF 27-15 p. 2-7; *see also* Pl.'s Ex. 16, ECF 27-16; Def.'s Ex. M, ECF 26-13. This vitriolic doxing and publicity resulted in numerous calls and emails to the District, some of which were vulgar, profane, and threatening.

Stender reported to Crook that 111 emails and 140 calls came into the District regarding Crook's post. Def.'s Ex. H, ECF 26-8. He instructed administrators, directors and supervisors to send all calls to his office, which is physically separate from school buildings by one-half mile. Stender Test. Defendants' Exhibit F includes a chart representing the total calls fielded from August 18 through September 15. Def.'s Ex. F, ECF 26-6 p. 1. The chart shows the number of calls on September 11, 12, 14, and 15, was not significantly different than the number of calls taken during the preceding weeks, and was still lower than on August 24 and 25. Def.'s Ex. F, ECF 26-6 p. 1. It is unclear how many calls and emails related in any way to Crook or her

comment, how many were from members of the school community with a legitimate interest in the management of the school, or how many supported Crook or disagreed with her. "[W]ithout more," vague or conclusory concerns by the employer "runs the risk of constitutionalizing a heckler's veto." *Melton*, 147 F.4th at 903 (quoting *Sexton v. Martin*, 210 F.3d 905, 912 (8th Cir. 2000) and finding evidence of disruption insufficient where based on allegation that "several police officers and city-council members were upset and "'phone lines [were] jammed'" with calls from "concerned citizens'").

Defendants' Exhibit L shows transcripts of 104 voicemail messages recorded by the District and *one* appears to be from a parent of a student – Danny Frye. Def.'s Ex. L, ECF 26-12 p. 5. Defendants submitted only two emails into evidence expressing concern that Crook's comment showed her to be unfit to be around children. *See* Denton Email, Def.'s Ex. I p. 1-2; Daughenbaugh Email, Def.'s Ex. I p. 3, 5 (duplicate) ECF 26-9. A public employer "must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded the plaintiff's performance or impaired working relationships." *Lindsey v. City of Orrick*, 491 F.3d 892, 900 (8th Cir. 2007)(citing *Washington v. Normandy Fire Prot. Dist.*, 272 F.3d 522, 527 (8th Cir. 2001)). The District has approximately 1000 students enrolled. The response attributable to contacts with any connection to the District or surrounding community was negligible at best. Stender Test.; Keeler Test.; Def.'s Ex. N; Def.'s Ex. O, ECF 30-1.

The angry and sometimes threatening nature of the communications lead to additional security "for about seven days" after Crook's post. Stender Test. Stender testified that he did not blame Crook for the threatening communications. He stated, however, that he was "not going to wait for a bullet to fly" before taking additional security measures. *Id*. Stender and Sheriff Bolton testified that they collaborated to increase law enforcement "out of an abundance of caution" and

to make students feel safe. The high school, Crook's regular work location, maintained the normal level of law enforcement presence with just the School Resource Office present. The District's prediction of disturbance to the educational environment was not fulfilled when it brought in law enforcement, knowing there was no active threat of violence. There is also no evidence that any student has left the student to enroll elsewhere due to this precautionary security measure.

The District's prediction that students and funds will walk out the door if Crook returns is equally unreasonable and unsupported by the evidence. Messerole's only hesitation to return Crook to the classroom is his belief that it will prompt a reaction from those who disagree with her Facebook comment, because "parents will have something to say" and some people "thought she was wrong." Messerole Test. Driskell heard from one parent who would "not allow their child to be in Crook's class." Driskell Aff., ECF 39-1 ¶ 8. Stender testified that retaining Crook will cost the District students and funding, but he testified that possibly six parents of students (across a student body of 1000) indicated they may remove their child from Crook's class or the school all together if Crook returns. *See* Creighton Aff., ECF 39-6 (parent of two children in the District, who believes Crook's post "celebrates the shooting and death of Charlie Kirk," stating she would "make sure [her] child was placed in a different classroom" due to a lack of trust in her ability to teach effectively); Daughenbaugh Aff., ECF 39-5 (parent of one child in the District stating he would "pull my child. . . and send them to a private school" if Crook returns); Frey Aff., ECF 39-4 (parent of one student who believes Crook's comment was "celebrating the death of a public figure, which deeply upset [him]" stating "[t]eachers are there to teach students, nothing else" but not that he would make changes to where his child is educated if Crook returns); Kramer Aff., ECF 39-8 (parent of two students stating he found Crook's post "obscene"

and would refuse to allow his child to be taught by Crook if she returned; Strauss Aff., ECF 39-7 (parent of one student who was "angered" by Crook's post because it "celebrated murder" would pull his student from the school if Crook returns.). Not only are these predictions of disruption speculative, but they are not reasonable as they rely on parents having inaccurate and incomplete information. *U.S. v. Treasury Emps.*, 513 U.S. 454, 492, 115 S. Ct. 1003, 130 L.Ed. 2d 964 (1995)(explaining weight should be given to employers' "reasonable" predictions of disruption). Messerole testified that he is unaware that Crook had ever discussed her political beliefs in her English classes. *See also* Brown Decl. ("I never heard Ms. Crook talk about politics or her personal beliefs in the classroom."), ECF 38-3 ¶ 3; H. Riley Decl., ECF 38-7 ¶ 3. Stender testified that the District will move students from one teacher to another under "extreme circumstances." Crook testified that there are two teachers – she and another – who teach the same English courses, which would allow the District to accommodate such a small number of offended parents if their children *happened* to be assigned to Crook's classes.

The District has failed to show an adverse impact on the public service it performs – educating students. Ellie Soosloff, a high school math teacher who sees 80 to 100 students in a single school week, testified that there was no disruption to her classes and no students left her classes in the days following Crooks comment. Soosloff Test. The greatest disruption to Soosloff's classes was on September 12 when Driskell made an announcement over the intercom that due to an unsubstantiated threat of violence there would be an increased law enforcement presence on school grounds. *Id*. Student expressed confusion as to why law enforcement would be necessary for an unsubstantiated threat. *Id*.

Any disruption to student learning was the result of the District's placement of Crook on administrative leave and its assignment of a less qualified substitute teacher in her place. Stender

Test. There appears to be little dispute that the only disruption to the delivery of educational services -– the District's public purpose – was Crook's absence. There has been no showing that Crook's comment had an impact on the District itself. *See Melton*, 147 F.4th at 900-904 (finding public employer failed to show actual disruption where fireman's antiabortion post was followed by calls from angry citizens and city-council members but no impact on services or performance).

If the Court finds an actual disruption or reasonable belief in the potential for disruption, the Court must address whether the evidence of an adverse impact on the efficiency of the District's operation weighs in Crook's favor. *Rankin*, 483 U.S. at 388 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968)("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."). After all, "government employers often have legitimate interests in the effective and efficient fulfillment of their responsibilities to the public." *Lane*, 573 U.S. at 242. This inquiry considers the public employer's interest in "maintaining proper discipline," *Id.,* and avoiding "[i]nterference with work, personnel relationships, or the speaker's job performance," *Rankin*, 483 U.S. at 388. The burden of this showing rests on the Defendants. *Id*.

The mission of the District was never compromised by Crook's conduct. Her comment did not cause substantial disruption to the core purpose of the District. Classrooms were not disrupted, student discipline did not arise, no violence resulted, no protests were held, staff were called to no meetings to address unrest. *See generally* Linch, Fry-Schnormeier, Granger Decls. The "disruption" to the school environment cited by Defendants arose first from the targeted

effort by conservative media outlets like the Iowa Standard, and politicians, to highlight social media messages by public school teachers which they found objectionable. The District's own repeated public statements amplified the impact of those attacks within the surrounding community. These factors, as opposed to any conduct by Crook, generated unwanted attention to the District and Crook. *See* Pl.'s Ex. 17 (showing post by Daughenbaugh publicizing Stender's contact information and suggesting Crook's "best protocol" was to "connect your top lip to your bottom lip."); *but see* Daughenbaugh Decl. (advocating for Crook's termination due to the safety issue *she* caused). The actions of an employer or another person in escalating controversy or manufacturing harm to the District's operations should never justify adverse action against an employee like Crook.

### 3.    The District's Motive for Adverse Action Was Crook's Speech

Finally, the Court must determine whether the motive behind the adverse action against Crook was due to her protected speech. The District's conduct in response to Crook's Facebook comment shows that it was her viewpoint that motivated its retaliation against her and not disruption to its operations. Stender learned of Crook's Facebook posts around 6:30 p.m. on September 10. Stender Test. He was contacted by a member of the Board of Directors and one parent, "Mr. Frey," who expressed anger and urged Stender "to do the right thing." *Id*. By 9:26 p.m., Stender had placed Crook on administrative leave. *See* Pl.'s Ex. 6. He then unilaterally determined the "values, beliefs, [and] opinions" on behalf of the District and declared Crook's comment did "not reflect" them. Pl.'s Ex. 7, ECF 27-7. His conclusion did not change at the conclusion of his investigation - he deemed Crook's comment "inappropriate and inconsistent with the [D]istrict's values." Def.'s Ex. H, ECF 26-8. There is no evidence that Stender has the authority to set the District's values. There is no policy set by the Board of Directors espousing

the District's values. And, there is no evidence Stender interviewed anyone but Crook in the course of his investigation.

### B.    Irreparable Harm to Crook and Relative Harm to Defendants

In the absence of a preliminary injunction, Crook will suffer irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19, 141 S. Ct. 63, 208 L. Ed. 2d 206 (2020); *Iowa Right to Life Comm., Ins. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "An injunction is a matter of equitable discretion." *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U. S. 7, 32, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). "Balancing the equities is an important part of the analysis because it avoids unnecessary real-world injury to people with colorable legal claims." *Trump v. Orr*, 223 L.Ed.2d 180, 181 (2025). The "touchstone" of equitable relief, like the relief sought here – a preliminary injunction – is "fairness." *Id.* at 183.

It is not lost on Crook that a preliminary injunction is an "extraordinary" remedy. *Morehouse Enters., LLC v. BATFE*, 78 F.4th 1011, 1016 (8th Cir. 2023). Nor does she take lightly that the burden of establishing irreparable harm rests on her shoulders. *Id*. Crook does not mistakenly rely upon the strong language of *Elrod* while she points to the singular past restriction on her September 10 Facebook comment. *See Gray v. Mallory*, No. 4:25-cv-01057-LPR, 2025 U.S. Dist. LEXIS 229156, at *4-5 (E.D. Ark. Nov. 21, 2025). Crook has shown how the absence of a preliminary injunction will prevent her from "engaging in constitutionally

protected conduct." *Morehouse Enters., LLC*, 78 F.4th at 1017-18. Crook testified that the District's actions – investigating her on allegations of misconduct, threatening her with termination, and placing her on administrative leave, have placed her in fear of expressing her opinion on matters of public discourse. It is not a significant stretch to conclude that her teaching colleagues must feel the same restriction for fear of a similar fate. Allowing Crook to remain on administrative leave or otherwise allowing the District to engage in further adverse employment actions against her gives a clear and immediate impression, especially to those engaged in the "mob mentality" discussed by Messerole during his testimony, that Crook was in the wrong and the District's actions were lawful. The District's directive, which is still in place and prohibiting her from freely attending school events or entering upon the District's grounds, is another dimension of the ongoing restraint on Crook's speech in absence of a preliminary injunction. *Vollmecke v. Indep. Sch. Dist.*, No. 23-00644-CV-W-BP, 2023 U.S. Dist. LEXIS 237540, at *11-12 (W.D. Mo. Dec. 11, 2023)*(*stating prior restraint, even when the plaintiff has not requested an exception, "risks censorship").

Traditional damages awarded at the conclusion of this litigation may redress her economic harms, but the continuous chill of her speech as well as the speech of others similarly situated warrant equitable relief, even if "extraordinary." *See Hook v. Rave,* No. 4:25-CV-04188-KES, 2025 U.S. Dist. LEXIS 190287, at *13 (D.S.D. Sep. 24, 2025)(granting preliminary injunction to public university professor enjoining university's attempt to terminate him for post addressing Charlie Kirk); *but see Brown v. Young*, No. 4:25-cv-419-MW/MJF, 2025 U.S. Dist. LEXIS 223127, at *9 (N.D. Fla. Nov. 13, 2025)(denying preliminary injunction where employer's evidence of disruption was not rebutted by plaintiff who made a Kirk-related post).

Further, Crook testified to suffering the ongoing emotional harm of being kept on

administrative leave, prevented from teaching and coaching – her calling and passion. Due to the filing of the termination notice the District must now complete an employment reference reflecting its investigation of Crook, and the reasons therefor. Pl.'s Compl. TRO & Prelim. Inj., Ex. E, ECF 1-7; Iowa Code Sec. 256.146(25). If she applies for another teaching job through the Iowa Department of Education and its TeachIowa website, she must disclose the District's investigation, as well as any future termination, regardless of ultimate outcome. Pl.'s Mot. TRO & Prelim. Inj., Ex. T, ECF 12-3. Crook cannot now resign in the face of the current termination proceedings, because of the District's action, or her personnel records will lose their confidential status under Iowa Code Sec. 22.7(11)(a)(5). These are particularly "unique circumstance[s]" imposed upon her as a public educator which cause irreparable harm in the absence of a preliminary injunction. *See Gray, No. 4:25-cv-01057-LPR, 2025 U.S. Dist. LEXIS 229156, at \*6* (noting unique circumstances may "create an atypical irreparable harm").

At the same time, harm to students of the District continues if Crook is not allowed to return to work. The only interruption to the educational environment, according to Stender, Messerole, and Driskell, was the replacement of Crook with a less qualified substitute teacher. *See also* Brown, Granger, Linch, H. Riley, and Z. Wagner Decls. There is no dispute that Crook is a qualified and effective teacher. Messerole Test.

### C.    Public Interest

Restoring a teacher to her classroom during litigation is in the public interest where the Court has already found substantial First Amendment concerns and the Court has held an extensive evidentiary hearing with the overwhelming evidence establishing that the only disruption to the District's public purpose was the removal of the teacher from the classroom. Continuing Crook's administrative leave and her ban from the District's events and property

chills her speech as well as the speech of those similarly situated and imposes prior restraint against her speech within the school community. The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people" and "[s]peech by citizens on matters of public concern lies at the heart of the First Amendment." *Lane*, 573 U.S. at 235-36. The public has a strong interest in the protection of First Amendment rights; ensuring public schools do not engage in viewpoint discrimination against staff and students; and maintaining fair and constitutional employment practices for Iowa educators. Students benefit from a school district that respects constitutional boundaries, models civic tolerance, and avoids using political viewpoints as grounds for discipline.

## V.    CROOK'S OBJECTIONS TO DEFENDANT'S EXHIBITS

### A.    <u>District Exhibit F</u>:  "Total Calls" Chart and Incoming Message Log

Page 1 to Exhibit F ("Total Calls") is a line chart purporting to show the weekly call volume at the District's office from August 18 through about September 16. Pages 2 through 17 purport to reflect information about emails, calls and phone messages the District's office received from September 10 through September 29. The District has offered Exhibit F as evidence of a disruption to the District's office's operations in the days following Crook's September 10 Facebook post.

Exhibit F is inadmissible for lack of relevance under Fed. R. Evid. 401 and 402. Page 1, the "Total Calls" chart, is not relevant because it contains no information that would assist the Court in determining whether and to what extent Crook's post disrupted the District's core functions of educating children. It reflects no evidence that any increased call volume was attributed to parents of District students who were planning to withdraw their children from school because of Crook's post. Teri Keeler (hereinafter "Keeler") admitted that she did not

know how many of the calls were from District parents. Even if the Total Calls chart were relevant in some way, its content shows that the District is exaggerating any claimed disruption from Crook's post. According to the chart, the call volume in the days following Crook's September 10 post was only modestly higher than the prior week, and even lower than the week of August 24.

Pages 2-17 of Exhibit F similarly have no tendency to make the fact of any disruption Crook's post caused more or less probable than it would be without the exhibit. This document reflects no information identifying specific callers or email senders as a parent of a District student planning to withdraw their child because of Crook's post or any other information connecting these messages to the issues before the Court. Absent such key details the Exhibit provides no assistance to the Court in determining whether a preliminary injunction should be granted.

Exhibit F is also inadmissible for lack of foundation. The District attempted to lay foundation through Keeler but was unable to do so. Keeler did not testify that Exhibit F was a business record the District creates on a recurring basis and relies upon in conducting District affairs. She testified she and others were instructed to create it solely to document calls and messages received after Crook's post. She did not testify that she personally listened to all of the calls or read all of the messages reflected in Exhibit F and she did not explain the steps she followed collecting the data from the District's systems and assembling it to ensure that the collection was reliable and complete. She could not articulate which or how many of the calls or messages in Exhibit F were received from District parents threatening to withdraw their children. Without adequate foundation, Exhibit F is unreliable and should be excluded under Rule 602.

**B.      <u>District Exhibit J</u>: "Incidents of Safety Threats"**

Exhibit J is a compilation of social media posts (pp. 1, 4, 9, 26); emails (pp. 2, 3, 5); a letter signed by Messerole about an unsubstantiated threat (p. 6); a document titled "Creston Union Law Enforcement Center Dispatch Entry" (pp. 7-8); an Accounts Payable chart (p. 10); text messages between Stender and Sheriff Bolton (pp. 12-17); and text messages between Stender and School Resource Officer ("SRO") Mitch Pasheck (pp. 18-25).

### 1 . Exhibit J Documents to Which Crook Does Not Object

#### a. *Dillon Daughenbaugh's Post on Page 1*

Crook does not object to the admission of the post by Dillon Daughenbaugh on Ex. J p. 1, in which Daughenbaugh urges followers to send emails and make phone calls to Superintendent Stender demanding Crook's termination. Daughenbaugh's post is admissible for purposes of showing the effect of the message on his followers and is relevant to the Court's determination of the actual cause of any claimed disruption to the District's offices in the days after Crook's post. *See U.S. v. Beckman*, 787 F.3d 466, 484 (8th Cir. 2015) ("'A statement offered to show its effect on the listener is not hearsay'") (citing *United States v. Wright,* 739 F.3d 1160, 1170 (8th Cir. 2014)).

#### b. *September 12 Emails and Stender Post on Pages 4 and 5*

Crook also does not object to the admission of Ex. J pp. 4 and 5. Page 4 is Stender's September 12 post to District parents on its ParentSquare messaging platform about an unsubstantiated threat of violence and that Stender had requested law enforcement presence for the rest of the day because of it. Page 5 reflects emails between Stender and Driskell earlier on September 12 about the unsubstantiated threat of violence at the high school that day. These documents are relevant because they dispute the District's claim that it placed Crook on administrative leave because her actions created a threat that necessitated increased security.

Stender's post shows that he placed Crook on leave before the District received any threats or discussed adding security. These documents also show that it was not Crook's post that led them to request more security. Neither mentions Crook's post, connects the unsubstantiated rumor with Crook, nor confirms any actual threat to the District.

### c. *Stender's Text Messages Regarding His Request For Additional Law Enforcement*

Crook does not object to the admissibility of Stender's text messages on Ex. J pp. 12-13; p. 14 (with the exception of the portion stating "screenshots of Melisa Crook [sic] son . . . and statements that he has made"); pp. 15-17, and pp. 19-25. Like the emails and Stender's ParentSquare post on September 12, these text messages are relevant because they show that the District placed Crook on administrative leave well before it began receiving any threats. They show that Stender requested additional security because of the orchestrated threats he and the District received as a result of Daughenbaugh's post and similar calls to action around the country, not because of Crook's words in her post.

### 2. Exhibit J Documents That Are Inadmissible Hearsay Under Rule 801

"Hearsay is an out of court statement offered for the truth of the matter asserted." *Arnzen* v. *Tyson Foods, Inc.*, No. 18-CV-4060-CJW-MAR, 2020 WL 10486712, at *10 (N.D. Iowa Jan. 21, 2020), citing Fed. R. Evid. 801(c). "Hearsay is generally inadmissible." *Id.(*citing Fed. R. Evid. 802). The District offered certain documents in Exhibit J to prove the truth of the matter asserted, i.e., that the District was subject to threats because of Crook's post. Crook objects on the basis that the following Exhibit J documents are inadmissible hearsay under Rule 801: p. 1 (all content other than the Daughenbaugh post); pp. 2, 3 (emails); p. 6 (undated letter signed by Messerole containing hearsay statements, including statements unnamed female students had allegedly made to Driskell, that an unnamed student "overheard the conversation and repeated

something similar in the hallway for others to hear," and that "[f]our students at CCHS left for

the day . . . due to the perceived threats"); p. 7 (Creston Union Law Enforcement Center

Dispatch Entry "details" section containing hearsay statements); p. 9 (social media post photo);

pp. 11, 18 (social media post by unknown author);  p. 14 (the portion stating "screenshots of

Melisa Crook [sic] son . . . and statements that he has made"); and p. 26 (various social media

posts and threats on unknown dates by unknown authors).

### 3. Exhibit J Documents That Are Inadmissible Under Rule 401, 402 and/or 403

The statements in pp. 7 and 12 regarding Crook's minor son, and the photograph on p. 9

which purports to be a photograph posted by Crook's son, are also inadmissible under 401 and

402 as they do not make any fact more or less probable than it would be without the evidence.

They were not made by Crook or any District employee and, on their face, they are unrelated to

Crook's statement in her post. They are also inadmissible under R. 403 because their probative

value is substantially outweighed by the danger of unfair prejudice to Crook and to her son.

The following Exhibit J pages are also inadmissible based on relevance under Rule 401

and 402: pp. 7-8 (Creston Law Enforcement Center Dispatch Entry) and p. 10 (accounts payable

for security services). None of these documents tend to show whether Crook personally caused

any need for increased security, and it is undisputed that the District received no substantiated

threats that caused Stender to request additional security and incur its costs. It also is of no

assistance in determining whether or to what extent there was any disruption to the District's

educational operations.

### C. District Exhibit K:  Driskell September 12 Memo re: "Concerned Students"

Exhibit K is inadmissible under R. 801 and R. 602 because it contains several hearsay

statements about which Driskell had no personal knowledge. It contains hearsay statements from

"girls" that "the school was threatened as a result of the Facebook response by Mrs. Crook."
Driskell includes statements allegedly made by parents that they were concerned about what they
had heard from their students "about a possible shooting at the school."  He also reported that
parents had pulled four students from school that day "to ensure their safety."  Each of these
statements is offered to prove the truth of the statements made and is, by definition, inadmissible
hearsay.

### D.   <u>District Exhibit M</u>:  Various Social Media Posts

Exhibit M is 141 pages of social media posts by unknown individuals on unknown dates,
many venturing into hot political topics unrelated to Crook or her viewpoint on Charlie Kirk.
Exhibit M in its entirety is inadmissible under Rules 401 and 402, as its content is of no
consequence in the preliminary injunction decision. Even if some portions were arguably
relevant in that they show Crook was voicing an opinion on a matter of public interest, they
would be inadmissible under Rule 403 as cumulative and a waste of time, as there is no genuine
dispute that Charlie Kirk's death was a matter of public interest.  Each of the statements in the
posts in Exhibit M is also inadmissible hearsay under Rule 801, and no District witness testified
to having personal knowledge of the posts or laid foundation for their admission under Rule 602.

### E.   <u>District Exhibit N</u>:  Voicemail Recordings

The District offered into evidence multiple voicemail recordings together as Exhibit N.
Crook objects to Exhibit N under Rule 403 as confusing the issues, a waste of time, and a
needless presentation of cumulative evidence. Exhibit N is cumulative and it would waste the
Court's time to listen to the Exhibit N messages. The record already contains ample evidence
that the District received many threatening messages demanding Crook's termination because of
her statement about Charlie Kirk.  Admitting these recordings would also confuse the issues.

The only complaints that are arguably relevant are those made by parents of District students who were threatening to pull their students out of class or out of the District because of Crook's statement. The Exhibit N recordings do not identify the callers, do not show whether they have students in the District, and do not show the date these messages were received. Admitting these random calls confuse the issue of general politicized anger with those that are truly before the Court in deciding whether to grant Crook's Motion for a Preliminary Injunction.

### F.    <u>District Exhibit O</u>:  Phone Log

Exhibit O is a four-page, single-spaced document purporting to contain a list of calls, phone messages, and emails the District received starting at 9 p.m. on September 10 and ending on September 29. While the Affidavit of Taylor Royster states that Royster highlighted the individual callers who live in the District (Royster Aff. par. 5), the Exhibit does not identify which, if any, of the individuals listed is the parent of a District student who was removing their child from school because of Crook's viewpoint. Many of the highlighted lines are "missed calls" and no connection between the call and Crook's post has been established.  Finally, without a similar log from a similar time period before Crook's post for comparison purposes, Exhibit O cannot show an increased call volume following her post. Exhibit O is irrelevant and inherently unreliable under Rules 401, 402 and 602. Even if it were arguably relevant, it is inadmissible under Rule 403 as cumulative and confusing the issues for the same reasons as the social media posts from unknown individuals in the District's Exhibit M.

### G.    **Defendants' Declarations**

The parties agreed to allow testimony by sworn declarations in lieu of live testimony from certain witnesses. Generally, any declarant's statements about their personal opinion about Crook's viewpoint or her post are not relevant to any issues on Crook's Motion for a Preliminary

Injunction and are inadmissible under Fed. R. Evid. 401 and 402. Post-hearing, Crook further objects to the portions of the District's affidavits listed below for the following reasons:

1. **Addison Downing**. Crook objects that paragraph 14 and 16 are conclusory statements that "Crook's conduct" of making a Facebook post "significantly impaired her ability to perform her usual work duties for at least a week" and "impeded [her] ability" to address "other job responsibilities" that lack any factual support as to what specific job duties went unfulfilled, for how long, and the impact it had on the District, or facts connecting any unperformed job duties to Crook's statement as opposed to being caused by angry callers who disagreed with Crook's viewpoint and contacted her office to demand Crook's termination.

2. **Cody Frey**. Frey's affidavit consists entirely of his personal opinions. Frey's personal opinions are not relevant to any matter before the Court in determining whether to grant Crook's request for a Preliminary Injunction. The content of his affidavit is inadmissible under Rules 401 and 402 based on relevance.

3. **Virginia Harlan.** Harlan's statements in par. 12 that five students were pulled from class "due to the children and parents' concerns over school safety" is inadmissible hearsay under Rule 801 and were made without personal knowledge under Rule 602.

4. **Amy Lane.** Lane's statement in paragraph 3 that "[m]any parents stated they wanted their children removed from her classroom" is inadmissible hearsay under Rule 801. Her statement in par. 5, that "[m]y child and other students were aware of the controversy, and it caused distraction, discomfort, and discussion at school and at home" is made without personal knowledge as to "other students" and as to what was discussed "at school." These statements are inadmissible under Rule 602.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff Melisa Crook respectfully requests the Court to preliminarily enjoin Defendants from continuing Crook's administrative leave, termination proceedings, or any other adverse employment actions in retaliation of her speech; order Defendants to restore Crook to her teaching position and extracurricular duties; and grant such additional relief the Court finds just and proper.

Dated: December 22, 2025

Respectfully submitted,

/s/ Christy A.A. Hickman
Christy A.A. Hickman AT0000518
/s/ Becky S. Knutson
Becky S. Knutson AT0004225
/s/ Katherine E. Schoolen
Katherine E. Schoolen AT0010031
IOWA STATE EDUCATION ASSOCIATION
777 3rd St.
Des Moines, Iowa 50309
Telephone: (515) 471-8004
Facsimile: (515) 471-8017
E-mail: christy.hickman@isea.org
        becky.knutson@isea.org
        katie.schoolen@isea.org

/s/ Melissa Hasso
Melissa C. Hasso AT0009833
HASSO & WILSON LAW FIRM
111 E. Grand. Ave., Suite 212
Des Moines, IA 50309
Telephone (515) 224-2079
Facsimile (515) 224-2321
E-mail: mhasso@hwlawiowa.com

ATTORNEYS FOR PLAINTIFF

Copy to:
Janice M. Thomas
Ryan P. Tunink
LAMSON DUGAN & MURRAY, LLP
6400 Westown Parkway, Suite 280
West Des Moines, IA 50266
E-mail: jthomas@ldmlaw.com
         rtunink@ldmlaw.com

ATTORNEYS FOR DEFENDANTS

| Certificate of Service |
| --- |
| The undersigned hereby certifies that a true copy of the foregoing instrument was served upon the attorneys listed above at their respective addresses/fax number/e-mail addresses as disclosed by the pleadings of record herein, on the 22nd day of December, 2025. |

By:
☐ U.S. Mail          ☐ FAX
☐ Hand Delivered     ☐ Overnight Courier
☐ Email              X PACER

Signature: /s/ Christy A. A. Hickman